19-2718 from the Eastern District of Missouri, United States v. Leobardo Barraza Mr. Kernan Good morning, your honor. Thank you. My name is Kevin Kernan. I'm with the Federal Public Defender's Office. I'm an assistant in the Eastern District of Missouri. May it please the court, Chief Judge Smith, members of the panel, and Counselor Danis. I'm here representing Mr. Barraza. I want to give the background before I talk about my points raised. He was convicted of kidnapping during which death resulted back in 05. The incident occurred in 1998 and he was 16 years old at the time. The facts that reduced the trial were that he and another person, a co-defendant, who was never found, whose nickname was Chupacabra, enticed a woman and her young child, he was about 5 years old, to get in a car with them that began in Chicago. Leobardo had a connection with the woman and Chupacabra, perhaps with scheme, and got Leobardo to go along where they told her that they were going to do a run to Mexico for drugs and she could make a substantial amount of money. Leobardo persuaded her, according to the evidence, to get in a car with them and she drove. After a lengthy drive, when they got to an area in out-state Missouri, Leobardo, according to the evidence, faked car trouble, and at which time they got the woman, Eloisa, and her son out of the car. She was raped, murdered, and Leobardo held the child while this was going on and they killed the child. Chupacabra, as I said, was never found. Leobardo was not found until years later. He was living in Colorado. He was on probation at that time for a felony, an auto theft felony. The Chicago police came out and interviewed him. He admitted. He confessed without counsel that he was involved. Actually, many of the details I just described are from the trial from his statement. He gave them a description of actually how these two people died. He was convicted and he was sentenced, according to the guidelines and according to the statute at that time, to life imprisonment. Judge Limbaugh, Sr. of the sentence team made note that he had no choice. That was the only choice he had to set at that time. Counsel, we're familiar with the background facts of the case. As I understand the briefing, your principal argument here has to do with competence on resentencing. Would you move to that issue and explain to us why the sentence imposed on resentencing is not affirmable? Yes, Chief. Thank you. When we, at the sentencing, and we have to talk about Miller. Miller is the guiding light in this resentence. First of all, it says that juveniles, simply put, juveniles are not treated as adults for purposes of sentencing. This is the natural progeny of Roper V. Simmons. And then Gramby Florina. Gramby Florina said for non-death cases, or whether it's not a murder, life without probation or parole is not appropriate for juveniles. Counsel, your client wasn't treated as an adult in this case. I mean, the district court specifically cited the Miller fact, right? At the resentencing? Judge, thank you for that question. The problem we have, and we raised in the briefing, was, and we're asking, you know, as you saw from our second point, or alleging this plain error, he mentioned Miller, but we didn't follow, he didn't follow Miller. The way that sentencing proceeded was, we treated it as a variance. So, the judge at that point, Judge Limbaugh, Jr., stated, and he stated that the guidelines called, in the guideline calculation, he said the guidelines called for life, the statute certainly called for life, and I don't know if I ever said this, he even mentioned that he was being lenient, and he treated it as a variance downward. Our position is, under Miller, we don't treat it that way. Miller says, he didn't mention the Miller factors, we argued the Miller factors in terms of sentencing, and even at the end, when I objected to the sentence, I said he didn't follow the spirit of Miller. Miller, you don't start at life. When you read Miller, it says, for the use of colloquialism, out of the box, it says, life is not appropriate for juveniles, and he was 16 years old. And I can talk about the reasons why. So, what Judge Limbaugh should have done at that time, looked at the individual, looked at the Miller factors, looked at Mr. Barraza, and I'll get into details of what I think is appropriate, and then looked at, and we gave him, and then there was the court to see, of what other similar Miller-type resentencings, you know, what those individuals were getting on resentment. May I interrupt you to ask, does the United States v. Jefferson case, it's our 2016 case, does it completely bind this panel on almost all of your arguments about this guideline range, and what the guidelines say? No, Your Honor. I think Miller, I realize Jefferson was post-Miller, but I think under Miller, you probably anticipate I was going to disagree, but under Miller, you know, you don't start at life when you're sentencing a juvenile. Well, now, the guidelines still say life, right, as of this minute, correct? Yeah, that's what I meant, but the sentencing commission has not adopted a Miller guideline, so the guideline that we're talking about in Jefferson, and the guideline that Judge Limbaugh was talking about, I don't think, in our position, it's not appropriate under Miller. Counsel, the key word from Miller is mandates. If it mandates life, and it's a mandatory scheme, it's a mandatory, the guidelines are voluntary. So that's why the guidelines, the voluntary guidelines, can still say life because they're voluntary. They don't mandate. Well, the statute mandated life at the time. The guidelines track the statute. Wait, Judge Limbaugh didn't mention the statute, did he? The second that Judge Limbaugh? Yeah, he did not. He only mentioned the guidelines, correct, the voluntary guidelines. Yes. Okay. Well, I think under Miller, Miller, you're right, Miller says one of the holdings of Miller is mandatory life is inappropriate for a juvenile in any circumstance. But then it goes on to say that life for juveniles should be reserved for, well, my terms are the worst of the worst. Right. But Miller says irretrievably broke and irretrievably, he used the word irretrievably. Let's put my reading glasses on to get it exactly as you're well aware. So Miller says life is the ending when you're talking about a juvenile. It's not the beginning. So therefore, I don't think, and I know I'm disagreeing with Jefferson, but, you know, this Miller, these Miller sentencings, we couldn't find any, many others, if any, that got to this point. It's a new world. And I think for the judge to sentence with it within the spirit of Miller, you don't start with life and work your way down. And that, I would assume, is done. So I would say the guidelines aren't the way to appropriate. Miller, in a way, dictates a different type, more of a, you know, I would say a bottom-up, more of a 3553A analysis, more in line. You know, the same language in Miller comes from Romer and also comes from Gardner. You look at the individual, and then you look at those factors, which I'll talk about in a second, and then you craft the sentence based on that individual. You don't start at, as we tend to do with the guidelines, you know, this is what's dictated. Do we go lower? That's the thrust of our argument under Miller. Because when you, and even though the guidelines, as we say, are not mandatory, you know, the practical matter with this, they're almost treated like they are in these serious sentencings. And I know I'm going to say it for the third time, Judge, but I really think Miller, the thrust of Miller is you look at the individual. You don't start out with a life sentence with the individual. You look at that child, and you look at the factors of the child. Of course, you factor in the conduct. And that's how you set the appropriate sentence. I'm leaving out one thing. You look at that, well, they use the expression mind run. You know, you look at what the rest of the world's doing in regards to these sentencings. Now, Judge Lindborg, Jr. did mention that. He mentioned all those things we just talked about. This is what Judge Kobisch just said. But I think the problems began when we started out with this is the guideline. He's looking at a life sentence. So, and as I've already said, he used the word lenient, which I very nicely tried to correct him on, Your Honor. And so we're not talking about leniency here. Leniency to me means that he's looking at life, and he thinks he's going to give some break off those lives. And that's not true. Counselor, are you making the argument that Miller compels the district court not to do what the district court did here? Is it what you're arguing? Yes. I think in this particular, well, short answer to you is yes, Your Honor. We don't start off with the juvenile presuming life under Miller. Actually, the way you read Miller is you presume it's anything but life. Then you look at the factors. You look at the Miller factors with the juvenile, which I think at time I'll talk about. And then you look at what that universal, sort of like a RETA analysis. You look at that universal of cases and see where they are. And then you make the determination of the appropriate sentence. And I don't want to make light of the facts. The facts of the case or the conduct, of course you factor that in. But Miller's really clear. And there's language in there. Justice Kagan writes, basically, now as you know, these cases are going to be bad cases. Every murder case, a life's lost. Someone's not with us anymore because of the conduct, in this case, of the juvenile. And then you realize these cases are going to be serious. But they say the focus should be on the juvenile. And the reasons, well, I gave you a short answer, a long answer to that sheet. But I think that's the way the analysis. We raised a plain error because, frankly, I was a lawyer standing there. I fell into the same trap. Well, I think it was the second Miller sentencing in this district. And the way we normally day-to-day do sentencing is we always start with a guideline calculation, even though it is advisory. And then either through negotiations or in sentencing, we're always starting at that point. These are the guidelines. They're appropriate. They're not appropriate. I think Miller, because we don't have any long guidelines that say the high end of the guidelines should ever be considered. The guidelines are all fair game. Miller's flat. Can you give us something to indicate what would be different on a resentencing conducted, as you described, not using, as you say, consideration of life as the starting point, but as you point out, the facts in this case are egregious. What would indicate that a different formula, so to speak, of considerations by the sentencing court would produce a different sentence than 50 years? Well, two things. First of all, I'm going to answer that. But I think if he did it wrong, the idea that it's going to be a different sentence shouldn't control whatever gets sent back. So I think in the universe, it's probably accurate that he could go back and do a Miller analysis and maybe end up at the same result. We don't know that, though, because remember, he starts at life. He's thinking, this person deserves life, so when I go down from life. So that could make a difference if he starts from the ground up. And I also think, although we briefed it, we argued it, if he starts with, who is this individual? And it's brief, but let me point to one indication that I think was underplayed. The co-defendant, I call him co-defendant he's ever found. His nickname was Chupacabra. Chupacabra is Spanish for goat sucker, and it's a mythical creature. Not that old. When I say mythical, I don't think it goes back centuries. It's like in the 90s. People started talking about this. In certain Spanish-speaking countries, attack goats and suck the blood out of them. I'm familiar with the term. Me too. Okay. Now, I'm sorry. I wasn't until this case. So this person, and I don't think it got played, because we never found this person. We wouldn't be standing here if we found the person, probably. But he preyed on the 16-year-old, because that's what Chupacabras do. They prey on the weak. That's a strong factor that I think got underplayed. Then I also think the immaturity. He acted, if you look at some of his actions, while driving the car, enticing this woman. On one hand, you could say, that's my personal timer for 10 minutes. Well, your time has expired. Okay. Would you like me to continue, or I'll wait until I have? I think if he doesn't, if I can give you a minute. I'm sorry. Your time's expired. I'll give you a minute or two of rebuttal after the government. Thank you very much. Ms. Danis? Good morning, your honors. May it please the court, Mr. Curran. My name is Nancy Danis, and I'm an assistant United States attorney in the Eastern District of Missouri. It's my privilege to represent the United States in this matter. We're asking the court to affirm the decision of the district court for several reasons. I want to start with the issues addressed by Mr. Curran with regard to the guideline sentence. Mr. Curran briefly touched on the standard of review, which brings us here today, but I think that's the lens through which we need to view this analysis, of course. The court can only overturn the district court's decision if they find that it committed plain error. Mr. Curran spoke at length about the Miller sentencing factors and what Miller, the spirit of Miller. But importantly, he does not point to any other sentencing guideline scheme that should have been used in place of the guideline that was calculated, because that was the correct guideline. In order to establish that the court committed plain error, I don't believe that Mr. Curran can satisfy any of the prongs of the plain error standard. There was no deviation from a legal rule. 2A.1.1 applies not only in cases of intentional homicide, but when a homicide occurs during the commission of delineated felonies, one of which is kidnapping. That legal error has to be clear and obvious, which it certainly isn't in this case, because they can point to no alternative to that sentencing structure. And furthermore, it must have affected the defendant's substantive rights. Even using the kidnapping guideline, with all the enhancements that would have occurred in this case, it still would have produced a guideline of life. So the defendant did not suffer any prejudice. So as such, I don't think it can be said that the district court committed plain error in applying the life guideline to the defendant. Now, this kind of dovetails into the appellant's third point in their brief, which is that the 50-year sentence imposed was substantively unreasonable. And I think this is where the district court really honed in on those Miller factors in their sentencing, and they considered it in their 3553A analysis. Judge Limbaugh, Jr. was actually the judge, I believe, at the original sentencing in 2008. He did not preside over the trial, but he did preside over the original sentencing. And then he was back. Let me interrupt you. I thought Senior had all of it originally, and Junior had it now. Excuse me, let me finish. Because that was the year that Limbaugh, Jr. was confirmed. Did you say Senior only had the trial, and Junior had the original sentencing? That's correct, Your Honor. Okay, proceed. I was wrong. Go ahead. Thank you. So Judge Limbaugh, Jr. has been intimately familiar with this case, not through the trial, but certainly from the original sentencing and through this date. So he's in a very unique and well-positioned to make a determination as to the nature and circumstances of the offense, and the history and characteristics of the defendant. And in order to overturn the substantive reasonableness of the 50-year sentence, this court would have to find that the district court abused its discretion. Now certainly Mr. Kern and the appellant disagree with the weight that was given to the various 3553A factors, and even to the Miller resentencing factors. But that in and of itself is not sufficient to overturn this sentence and suggest that the court abused its discretion. Let me interrupt you again. Is it true what the other side says, that this is the highest given to a juvenile since Miller? That I cannot confirm, Your Honor. I do not know. Well, they say clearly it's the highest in the Eastern District. Correct. You know about the Eastern District. It's the highest in the Eastern District, right? Yes. Okay. And then they say it's the highest in the Eighth Circuit, and they cite cases. And then they infer or imply or something that it may be the highest in the country. Do you think that's true? I can only say within the Eighth Circuit, Your Honor. And I believe that it is one of the higher sentences. However, I think that there were 14 Miller resentencing cases that were cited in conjunction with their sentencing memorandum. Mr. Kern did acknowledge that there were also some outliers that existed. And I'm not familiar with the outliers. I'm not familiar with the exhaustive list of Miller resentencing cases. But I do think the District Court made a very good record as to why the facts of this particular case were particularly egregious. Even with the defendants, you know, what Mr. Kern wants to suggest as a minor role or a lesser role than the lead defendant who was never apprehended, there were certainly tremendous, you know, the nature and circumstances of this offense were particularly egregious. And the Court makes that distinction. Furthermore, the District Court is not required, pursuant to this Court's decision in Barron in 2009, which was drafted by Judge Smith, the Court is not considered or is not required to consider every single case and compare its sentence to the previous sentence imposed. They're not required to compare the facts of every single case like that. It's just too onerous. And the Court is not specifically required to respond to every single argument advanced by the defense at the sentencing. But the Court did acknowledge that, yes, we are here because this is a Miller resentencing. I understand that we have to treat the defendant as a child or as a juvenile. The Court made a very clear record on this. He just focused on the egregiousness of the acts, the premeditated nature of the acts, the defendant's role. The defendant, Mr. Barraza, was really the architect of the ruse to lure this woman and her small child out of Chicago. Are you overstating that because the other person's much older, this mythical person involved is older and more experienced and more everything? You say the architect. Do you want to say one of the architects? I will say that Mr. Barraza was the one who had a relationship, a friendly relationship with Ms. Aloiza, much more so than the co-defendant in this case, and therefore she trusted him more, so he created the ruse. He provided the story to her. Perhaps architect is too strong a word. One of the architects, go ahead. I believe that the record that the Court made is certainly sufficient to withstand this abusive discretion standard, despite it being 50 years is certainly a significant sentence, but one that is warranted by the facts and circumstances of this case. Ms. Davis, what does Miller require of a resentencing judge in a juvenile case like this? Your Honor, like Mr. Curran stated, it requires that a life sentence not be mandatorily imposed, but that the defense or the judge consider, when I say the history and characteristics of the defendant, Miller really talks about juveniles existing on this spectrum from transient immaturity to irreparable corruption, and it really asks, Miller asks the District Court to take into consideration where the defendant exists on this spectrum and conduct an analysis accordingly, and I think the Court did undergo that in this case, and they did, not just on the sentencing record, but they reviewed all the arguments that Mr. Curran propounded in his sentencing memorandum, before imposing this sentence. In the Jefferson case, how long was the sentence in the Jefferson case? Your Honor, I am not intimately familiar with the Jefferson case. Because I have a note here, I think it's a typo that says it was also 50, but we'll look and see. Proceed. Thank you, Your Honor. If there are no other questions with regard to the substance of reasonableness, I lastly want to touch on this competency issue, because admittedly there's a lot in the briefing in what could be considered a battle, kind of a battle of the experts, but what this Court is here to consider is whether Judge Limbaugh, Jr. committed clear error in relying on a new psychologist report finding this defendant competent to proceed to sentencing. And this finding, and this Court would have to find that that finding of competence to proceed was clearly arbitrary, unwarranted, or clearly erroneous. And for the reasons pointed out in the briefing, this Court had several reasons. Again, was uniquely in a position, given the length of this litigation, and how long this case has been pending, was in a unique position to understand the defendant's filings, certainly to review the litany of the defendant's filings in this case, and to review all four of the psychological examinations that the defendant had undergone, or at least had been attempted to be undergone on the defendant. Mr. Barraza, according to Dr. Woods' most recent report, was never found to have any kind of mental defect or anything, and the biggest point that she indicated was that he was able to proceed, he was able to understand the nature of the proceedings, and able to assist his counsel. He just was not willing to do so. And that's a really important distinction that Dr. Woods makes, and that Judge Lumbaugh relied on in finding the defendant competent to proceed in this resentencing. Because the court relied on a report finding him competent, and it was the most recent report, and based on over four months of observation of Mr. Barraza at her facility, it cannot be said that the district court committed clear error in relying on that finding. Unless the panel has additional questions related to any of these issues, I thank you for your time, and I would yield the rest of my time. Thank you, Ms. Danis. Thank you, Your Honor. Mr. Curran, I'll give you two minutes to respond. Mr. Curran, your mic's not on. I can't tell you how many times I've mocked people to do that, and here I am doing it myself. With the weak sentence of Melina Martinez, where the court sentence was an erroneous guideline. The calculation was wrong. Everybody got it wrong. The sentence the person received was at the high end of the correct guideline. They certainly still sent it back for resentencing because there was error to begin the sentencing process or the calculation with the wrong guideline, and that's what I believe is going on here. We started with life, and it was the wrong guideline. A proper sentencing would- What would have been the right guideline? With us? Yes. We had no guidance from the Sentencing Commission, so my suggestion is we look at the other juveniles and look at that as sort of the mind-runner in the universe of cases and look at them factually with this. He got 8 to 20-some years more than other juveniles, and that ranged from 14 to 17, I believe. So that's what I think we should have done. That's how it should have been argued. Is that the kind of remedy you can get on plain error? Well, Molina-Martinez, they had- I think if you follow- My argument is that starting at life was error, and under Molina-Martinez, that would apply. So we started with the wrong guideline. We started the wrong way. So it should go back so we can do it the right way and not start with the presumption of life. Start with the presumption of anything but life and see if he's one of these irretrievably broken characters, which he clearly isn't. And then you tailor the punishment to the individual. That's the focus of Miller. I believe that would be a lower punishment, because, clearly, if you see how he lived his life before and after, this was clearly out of character for him, and also, clearly, it was in the throes of his brother, Hector Chupacabra. And Jefferson didn't discuss that with Molina-Martinez. I'm over time again, Judge. I'm sorry. Thank you, Mr. Kern. Thank you also, Ms. Davis. We appreciate both counsel's presence with us this morning.